# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| TERESA RODRIGUEZ, | ) | |
| by | ) | |
| RICHARD M. FOGEL, TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 CV 4710 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff Teresa Rodriguez filed her amended complaint against the City of Chicago (the

"City"), alleging that the City violated the Family and Medical Leave Act ("FMLA") and the

Americans With Disabilities Act ("ADA") by reassigning some of her duties as deputy director

of the O'Hare Modernization Project and then discharging her. Before the court is the City's

motion for summary judgment on Counts I, II and IV of the amended complaint [#168].[1] For the

following reasons, the City's motion is granted in part and denied in part.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings

---

[1] Count III of the amended complaint, which alleges discrimination and discharge in violation of
the Employee Retirement Income Security Act, was dismissed without prejudice on March 31, 2009
[#49].

and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *Id.* While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

## BACKGROUND[2]

Teresa Rodriguez was employed by the City from July 18, 1988 to September 20, 2006, when her employment was terminated. Rodriguez was the deputy director of the O'Hare Modernization Project ("OMP") from December 1, 2004 to September 20, 2006. Her responsibilities included administering the OMP's budget, implementing financial controls, and managing two OMP facilities. Def.'s Stmt. of Material Facts ("Def.'s SoF") ¶¶ 9–10; Pl.'s Ex. B.[3] Rodriguez's prior positions with the City included director of administration for the

---

[2] This court has jurisdiction over Rodriguez's claims pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 2617(a)(2), 42 U.S.C. § 2000e-5, and 42 U.S.C. § 12117(a). Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391 because the events giving rise to Rodriguez's claims occurred in this district.

[3] The City argues that Rodriguez's Exhibits A, B, E, F, G, H, I, J, L, M, N, O, and P should be stricken for lack of foundation. The City produced these documents in response to Rodriguez's discovery
(continued...)

Department of Human Services and deputy commissioner for the Department of Planning and Development. Her prior job responsibilities included overseeing the human resources staff and managing human resources for the Department of Human Services. Rodriguez testified that she was familiar with the procedures for taking leave under the FMLA and knew that FMLA leave forms had to be turned in to the human resources department for processing and review.

## I.  Rodriguez's Illness and Termination from Her Position at OMP

Rodriguez had diabetes and high blood pressure prior to January of 2006. That month, however, Rodriguez also began to suffer from heart palpitations. She was admitted to the emergency room at Christ Hospital because of her heart problems on January 27, 2006, after she awoke with "cardiac symptoms." Def.'s Ex. 5, Rodriguez Dep. 107:6–20. While she was at the hospital, Rodriguez spoke on the phone Rosemarie Andolino, the executive director of OMP. Rodriguez told Andolino that "they were running tests, my heart had gone to 296 palpitations, and that I had been transported from my home to the emergency room where they were checking because the doctors had a suspicion that I suffered a heart attack." *Id.* at 113: 11–23. Rodriguez also told Michael Boland, the former first deputy of OMP, Patricia McCaskill, the assistant commissioner over human resources at OMP, and Denitra Gardner, her assistant, that she was at the hospital. Rodriguez was discharged on February 1, after receiving a diagnosis of supraventricular tachycardia ("SVT"), which is an abnormally rapid heartbeat that can cause

---

[3](...continued)
requests and court considers the authenticity of the documents to be uncontested. *See Medline Indus., Inc.* v. *Cymbion, LLC*, No. 09 C 581, 2010 WL 4736315, at *10 n.9 (N.D. Ill. Nov. 16, 2010) (noting that the "very act of production [is] implicit authentication"); *Vulcan Golf, LLC* v. *Google, Inc.*, 726 F. Supp. 2d 911, 915 (N.D. Ill. 2010). The court would allow Rodriguez to create a proper foundation for their admission at trial. The City's motion to strike Exhibit B and other documents produced during discovery is denied.

severe palpitations, dizziness, and angina.  She was ordered not to work and to stay on bed rest.  On February 8, Rodriguez received a note from her doctor that certified that she had been "medically disabled and unable to work" from January 26 to February 8.  Pl.'s Ex. F.  The note states that Rodriguez could return to work on February 9.  *Id.*

Rodriguez returned to work on February 10 and attended a late morning meeting with Andolino.  After the meeting ended, Rodriguez went back to her office because she was not feeling well.  She took her blood pressure and read that her blood pressure was 170 over 107.  Rodriguez then called her doctor, who told her that she needed to go to the emergency room because they were concerned that she was having another SVT episode.  Several of Rodriguez's colleagues at OMP were walking in and out of her office at this time, and one of them offered to take her to Resurrection Hospital.  Another colleague called an ambulance, and the paramedics came to Rodriguez's office and took her blood pressure.  Rodriguez told the paramedics that she had SVT.  She was eventually taken out of the office on a gurney while several employees at OMP watched.  Gardner accompanied Rodriguez to the hospital and called OMP from Rodriguez's hospital room.  Gardner told Andolino and McCaskill that Rodriguez had been admitted to the hospital and would have to stay overnight.  Rodriguez was hospitalized for about two days following this incident and was discharged with orders to stay home.

On February 18, while she was still home from work, Rodriguez experienced another cardiac episode and was re-admitted to Christ Hospital.  On February 20, Dr. A. Tom Petropulos performed an ablation procedure on Rodriguez's heart.[4]  When Dr. Petropulos was asked, at his

---

[4] Ablation is a procedure in which radiofrequency energy is used to create a tiny burn in an electrical pathway of the heart to stop the cause of tachycardia.  It is performed as treatment for SVT.

deposition, whether he considered Rodriguez's SVT to have been "cured" after he finished the ablation procedure, he responded, "Yes." Def.'s Ex. 22, Petropulos Dep. 27:19–22. Nevertheless, Rodriguez was hospitalized again from February 27 to March 1 because she was experiencing severe recurring chest pains, high blood pressure and heart palpitations. Rodriguez was examined by Dr. Thomas Bump, who thought that Rodriguez's chest plains could have resulted from the ablation. Dr. Bump advised Rodriguez not to engage in strenuous activity and to continue under observation. On March 1, Dr. Nouri Al-Khaled performed a cardiac catheterization on Rodriguez. The results from the procedure showed that Rodriguez's heart was "normal" and that there was nothing wrong with Rodriguez's coronaries or heart muscle.

Rodriguez returned to work on March 7 but did not work a full day because she was experiencing dizziness, heart palpitations, and angina. Before she left for the afternoon, Rodriguez told Boland that she was not feeling well and needed to go home. Rodriguez attempted to work on March 8 but again had to leave early because she was not feeling well. Rodriguez again told Boland that she was going home because she was ill. On March 9, Rodriguez met with Andolino and submitted a written request for an advance of ten days of sick leave. The request states that the sick days "will be used to cover absences from work in February and March of 2006, due to cardiac-related illness." Pl.'s Ex. G.

Rodriguez visited her primary care physician, Dr. Virendra Mathur, four times in March, April, and May and complained of gastric pains and dizziness.[5] Dr. Mathur monitored Rodriguez's heart activity with a Holter monitor from May 10 to May 12. Rodriguez also had two follow-up visits with Dr. Petropulos, on March 14 and 23, where she complained of dizziness, chills, chest pain, nausea, and low blood pressure. Dr. Petropulos concluded that her "various nonspecific symptoms . . . are not likely to be of a cardiac origin." Def.'s Ex. 22, Petropulos Dep. 32:17–35:6.

Sometime in the first half of 2006, Rodriguez met with Andolino and told her that she could not continue doing the same level of activity that she had been doing and that her job was too demanding, given her illness. Def.'s Ex. 5, Rodriguez Dep. 380:10–20; Def.'s Ex. 3, Andolino Dep. 192:1–194:24. Whether Andolino then offered to remove some of Rodriguez's job responsibilities is in dispute. Andolino testified that she asked Rodriguez what job responsibilities could be removed and then told Rodriguez to "get back to [her]" when Rodriguez did not describe the changes that she wanted to make. Def.'s Ex. 3, Andolino Dep. 193:4–14. Rodriguez testified that she received "no response" from Andolino when she said that her job was too taxing and that Andolino "didn't [indicate] one way or the other" as to whether Rodriguez would be given reduced responsibilities. Def.'s Ex. 5, Rodriguez Dep. 382:3–11. Neither Rodriguez nor Andolino could recall precisely when this conversation took place.

On June 1, Rodriguez attempted to work a full day at OMP but suffered a cardiac episode during a meeting with aviation officials and OMP contractors. She was taken to the hospital in

---

[5] Rodriguez met with Dr. Mathur on March 31, April 10, May 10, May 12, July 25, and September 19, 2006.

an ambulance. Between March 1, when Dr. Al-Khaled performed the cardiac catheterization, and June 1, Rodriguez missed a total of eight full days of work and eight half days (3.5 hours off per day) due to illness or doctor's appointments. Def.'s SoF ¶ 61. Rodriguez also missed one day of work for "vacation" on March 31 and one half day due to her mother's illness. *Id.* Boland signed and approved each of Rodriguez's leave disposition slips during this time period. *Id.* ¶ 63.

At some time before June 5, Boland recommended to Andolino that Rodriguez's duties be reassigned because she was not adequately performing her job and he needed "somebody [to] get the job done." Def.'s Ex. 9, Boland Dep. 177:10–14.[6] Rodriguez returned to work on June 5. That day, she met with Andolino and Boland and learned that many of her duties had been redistributed to other individuals at OMP. Rodriguez learned that, going forward, she would primarily be responsible for ordering supplies, making sure that there was always a staff member covering the reception desk, and training support staff as well as contractors regarding the procedures for ordering supplies. Andolino told Rodriguez that her duties had been redistributed "because [she] had been out on June 1st at the hospital." Def.'s Ex. 5, Rodriguez Dep. 227:24–228:1. The distribution of Rodriguez's duties was memorialized in a memo to OMP staff. Def.'s Ex. 14.

After Rodriguez undertook her new responsibilities, she found that she became dizzy and physically exhausted from packing office supplies. Rodriguez told Boland that her new responsibilities continued to be a physical strain. Boland said that it would be possible to assign

---

[6] Boland testified that he made this recommendation "shortly before" June 5, 2006. He explained by using the phrase "shortly before," he meant that he and Andolino talked "days or weeks" before June 5, 2006. *Id.* at 176:21–22.

additional people to help Rodriguez pack the supplies. On July 25, Rodriguez met with Dr. Mathur and complained again of chest pain and dizziness when she changed position. The next day, Rodriguez met with Dr. John A. Burke, one of her treating cardiologists and complained of chest tightness, a pounding heartbeat, and high blood pressure. Dr. Burke ordered a test for an adrenal gland tumor and a thirty-day event recorder. The results of the adrenal gland test was normal and the thirty-day event recorder showed that Rodriguez showed no SVT.

Rodriguez called Dr. Al-Khaled's office on August 21 because her blood pressure was going up and down and she felt like she was going to pass out. She met with Dr. Al-Khaled on August 24 and Dr. Al-Khaled ordered a renal arterial Doppler and a CT scan because "there [was not] anything else we could do to [Rodriguez] from a cardiac perspective" at that time. Def.'s Ex. 23, Al-Khaled Dep. 29:2–38:18. Dr. Al-Khaled gave her a note excusing her from work for two weeks while she awaited the results of the tests. *Id.* at 41:18–43:22; Pl.'s Ex. F at D000958. At his deposition, Dr. Al-Khaled testified that his practice was to excuse a patient from work only when they requested it. Def.'s Ex. 23, Al-Khaled Dep. 43:19–21. He also noted, however, that his decision to excuse Rodriguez was consistent with his usual practice and that when "this patient had lightheadedness with episodes of near syncope . . . until I finish my workup, I'd rather that my patient wouldn't go back out to work." *Id.* at 43:2–5.

On August 25, Rodriguez met with Boland, gave him Dr. Al-Khaled's note, and said that she was "given doctors' orders" to stay home from August 24 to September 11. Def.'s Ex. 5, Rodriguez Dep. 254:4–15. Boland told her that because of her reduced responsibilities, OMP was going to change her job title and salary and that she would have to return the city vehicle that she had been using. *Id.* at 255:8–21, 279:15–280:1; Def.'s SoF ¶ 26. Boland granted

Rodriguez's request for leave, but asked that she wait until August 29 to start her leave because McCaskill was on vacation and he did not know how to enter the leave in the City's timekeeping system. Rodriguez said that it "would not be a problem" to start her leave on August 29 and agreed to come back August 29 for a half day. Def.'s Ex. 5, Rodriguez Dep. 256:18–21. Rodriguez returned to the office on August 29 and met with McCaskill. She told McCaskill that she would need to request FMLA leave "because [she] was not getting better." *Id.* at 257:16–258:9. McCaskill encouraged her to request FMLA leave. *Id.* McCaskill gave forms to Rodriguez that were for disability leave, not FMLA leave. Def.'s SoF ¶ 58 & Pl.'s Resp. thereto.

On September 8, Rodriguez told Boland that she would need to stay out of the office until September 12 because she had an appointment with her cardiologist and her cardiologist would tell her when she could return to work. Rodriguez met with Dr. Burke on September 11. Dr. Burke scheduled a referral for a second opinion because Rodriguez continued to report symptoms and Dr. Burke "had run through every test [he] could think of to help her and wasn't coming up with anything new." Def.'s Ex. 21, Burke Dep. 47:6–18. That same day, Dr. Burke gave Rodriguez a "back to work slip with no restrictions." Def.'s Ex. 21, Burke Dep. 39:23–40:12, 49:24–51:3. Rodriguez then scheduled an appointment to meet with a cardiologist at Loyola University, Dr. Ivan Pacold. She called Boland and told him that she would need to miss work because she was going to see a specialist.

Rodriguez met with Dr. Pacold on September 14 and he told her that he intended to do additional testing, give her a Holter monitor, and that he wanted her to do a cardiac rehabilitation exercise program. Dr. Pacold testified that he examined Rodriguez and reviewed her medical records and found no reason to believe that Rodriguez had experienced SVT at any time after the

ablation. His notes reflected that, after the ablation, Rodriguez "developed a wide variety of symptoms that do not appear to be related to the procedure or any other identifiable cardiac disease" and that Rodriguez was anxious about her health and "became essentially disabled by these concerns." Def.'s Ex. 24, Pacold Dep. 37:6–39:22, 46:1–47:21. Dr. Pacold testified that Rodriguez should have been able to physically sit at a desk, or he would not have recommended an exercise rehabilitation program. *Id.* at 30:6–10, 67:8–17. After her visit with Dr. Pacold, Rodriguez contacted Boland and told him that she would need additional medical treatment and would not be back at work until September 18. She said that she would bring doctors' statements justifying the additional leave.

Between June 1 and September 11, the date of Rodriguez's last leave disposition slip, Rodriguez missed eighteen full days and four half days of work due to illness or doctor's appointments. Def.'s SoF ¶ 61. She missed three full days and four half days for her mother's doctor's appointments and medical care. *Id.* Rodriguez also missed one day to attend her niece's wedding. *Id.* Boland approved each of these requested absences. *See* Def.'s SoF ¶ 63.

Rodriguez returned to work on September 18 and met with Boland in his office. Boland informed her that she was being terminated from her position at OMP effective September 20, 2006.

Rodriguez returned to Dr. Pacold on December 11, 2006 and did not have any cardiac-related complaints. Dr. Pacold's notes indicate that Rodriguez was "less stressed out" and that she was "doing well in cardiac rehab." Def.'s Ex. 24, Pacold Dep. 53:1–54:15. After she was terminated from OMP, Rodriguez was employed at El Valor from May 2007 to July 2008 and she left work twice because of SVT and high blood pressure. Def.'s Ex. 5, Rodriguez Dep.

443:18–444:6, 453:9–16.  Rodriguez was employed at Heartland Alliance from September 2008

to March 2009 and did not miss work because of her health.  *Id.* at 448:13–23, 453:17–23.

## II.    Rodriguez's Job Performance

According to Boland and Andolino, during the second half of 2005 Rodriguez

mismanaged two "open houses" for city contractors, failed to properly execute the move of

employees in the Land Acquisition group to a new location, failed to adequately prepare the

OMP budget, and failed to provide disclosures and reports that were needed for OMP's

anticipated sale of bonds in excess of $1.5 billion.  Def.'s SoF ¶¶ 14–19.  Andolino and Boland

testified that they discussed these job performance issues with Rodriguez on multiple occasions

during the second half of 2005 and in early 2006.  *See id.*  Boland could not recall using

discipline procedures with Rodriguez and did not document her poor performance.  Def.'s Ex. 9,

Boland Dep. 126:2–127:1.  Boland further testified that Rodriguez was responsible for

coordinating the move of the entire OMP department in September 2006 and that she failed to

meet several "milestones" in preparation for the move.  Def.'s SoF ¶ 20.  Boland stated that he

discussed these failures with Rodriguez sometime prior to the reassignment of her duties on June

5, 2006.  *Id.*

In addition, Boland and Andolino testified that, sometime in the spring of 2006, Boland

informed Andolino that there were "deficiencies" regarding Rodriguez's work performance and

recommended that Andolino terminate Rodriguez's employment.  Def.'s SoF ¶ 22.  Because of

her friendship with Rodriguez, Andolino decided to allow Rodriguez to continue working for

OMP for six weeks in order to allow her to find a new job.  *Id.*  Boland testified that he told

Rodriguez that her job performance was not satisfactory and that she needed to find a new job

within six weeks.  Def.'s Ex. 9, Boland Dep. 43:7–48:8, 136:8–137:17; Def.'s Ex. 3, Andolino

Dep. 162:13–24.

At her deposition, Rodriguez denied that Boland ever informed her that she needed to

find a new job because of poor performance.  Def.'s Ex. 5, Rodriguez Dep. 529:6–530:6.

Rodriguez also denied that she failed at her job responsibilities in 2005 and 2006 and denied that

either Andolino or Boland discussed any alleged performance issues with her.  Pl.'s Resp. to

Def.'s SoF ¶¶ 14–19; Def.'s Ex. 5, Rodriguez Dep. 379:4–380:7.  To the contrary, Rodriguez

testified that Andolino complimented her on the success of the December 2005 bond issuance.

Def.'s Ex. 5, Rodriguez Dep. 368:14–369:2.  She stated that Boland's complaints about the OMP

budget were not related to her area of responsibility, and that the problem with the budget was

due to errors made by the contractor division.  *Id.* at 376:2–379:3.

## III.     Overpayment by the City

The City's records reflect that between June 16 and September 16, 2006, OMP

inadvertently overpaid Rodriguez a total of $20,557.21.[7]  Def.'s Ex. 16 at D00085.  The

overpayments resulted from McCaskill's clerical errors.  Where McCaskill was supposed to

dock Rodriguez's pay for missed work, she either failed to dock the pay or credited Rodriguez's

account for the amount that should have been docked.  Rodriguez was overpaid by various

amounts, ranging from $847.37 to $8,785.90.  Boland learned of the overpayment sometime in

the fall of 2006 and then told Andolino about the overpayments.  Andolino testified that the

overpayment would have provided independent grounds for termination because "the violation

---

[7] Rodriguez contests the City's calculations of the overpayment, *see* Pl.'s Resp. to Def.'s SoF ¶ 31, however her denial is not clearly supported by the exhibits cited.

of the integrity and that trust was just unacceptable." Def.'s Ex. 12, Andolino Dep. 42:3–9; Def.'s SoF ¶ 34. Boland also testified that he would have recommended Rodriguez's immediate termination because she was the employee responsible for financial and human resource matters and had effectively received double pay for days she knew she had requested to be absent without pay. Def.'s Ex. 4, Boland Aff. ¶ 10.

There is conflicting testimony as to when Boland and Andolino found out about the overpayments. Boland testified that he learned of the overpayment on September 19, which would have been after he met with Rodriguez and told her of her termination. Boland Aff. ¶¶ 9–11. According to Andolino, the overpayments came to light before Rodriguez had been terminated but after the decision had been made to terminate her. Def.'s Ex. 12, Andolino Dep. 23:24–24:4. It is undisputed that the City demanded repayment of the funds on September 20. On October 5, the City filed a complaint against Rodriguez with the Department of Administrative Hearings regarding the overpayment. The overpayment was settled on January 26, 2007.

Four other OMP employees were inadvertently overpaid in 2006. The amounts they were overpaid varied between $435.12 and $2,362.14. Def.'s Ex. 4, Boland Aff. ¶¶ 12–16; Def.'s Ex. 18.[8] Two of the other employees who were overpaid reported the overpayment to Boland and Boland did not recommend their termination. Def.'s Ex. 4, Boland Aff. ¶¶ 12–13. Boland did not recommend that any of the other employees be terminated because they did not have responsibility for financial matters in OMP and the amount of the overpayment was much

---

[8] For the same reasons discussed at note 3, *infra*, the court denies Rodriguez's motion to strike Exhibit 18, which is a list of OMP employees who were overpaid in 2006. The document was produced by the City during discovery and the court would allow the City to provide a proper foundation for its admission at trial.

less than in Rodriguez's case. *Id.* ¶ 14.

## IV. Procedural History

On April 10, 2007, Rodriguez filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC") alleging that she was discriminated against

based on disability. On August 19, 2008, Rodriguez filed a complaint alleging violations of the

FMLA and ERISA. The EEOC issued a right to sue letter on March 9, 2009. Rodriguez filed an

amended complaint on March 10, 2009, in which she also alleges that the City discriminated

against her and discharged her in violation of the ADA.

## DISCUSSION

## I. Compliance with Local Rule 56.1

In its response to Rodriguez's statement of additional facts, the City has moved to strike

numerous statements of fact and exhibits as not complying with Local Rule 56.1. Rodriguez has

in turned filed a motion to strike the entirety of the City's reply to her statements of additional

fact on the grounds that (1) the City made legal arguments in its responses, (2) the City cited

case law in its responses, and (3) the City failed to specifically admit or deny several fact

paragraphs. *See* Dkt. #187. Rodriguez also moves to strike the Affidavit of Charles Spence, the

chief programmer/analyst for the Department of Finance of the City of Chicago, on the grounds

that Spence was not identified as a potential witness in the City's Rule 26(a)(1) disclosures. *See*

Pl.'s Mem. at 2 n.1.

The majority of both parties' objections are without merit, and none of the summary

judgment submissions are a model of compliance with Local Rule 56.1. In accordance with its

regular practice, the court has considered the parties' specific objections and responses and has

included in the background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to the resolution of this motion. Rodriguez's overly broad motion to strike the City's reply to her statements of additional facts is denied. Rodriguez's motion to strike the Spence Affidavit is denied. If Spence's testimony is relevant to Rodriguez's claims that may proceed to trial, she may challenge his testimony and conclusions at that time.

## II.     Interference With Rodriguez's Rights Under the FMLA (Count I)

The FMLA provides eligible employees with the right to take up to twelve weeks of unpaid leave due to a serious health condition. *See* 29 U.S.C. § 2612(a)(1). After the period of qualified leave expires, the employee is entitled to be reinstated to the same position that she held when the leave commenced or to an equivalent position with equivalent benefits and pay. *Id.* § 2614. It is unlawful for an employer to interfere with an employee's rights under the FMLA by terminating her employment. *Id.* § 2615(a)(1). The plaintiff-employee has the burden to prove FMLA interference. *See, e.g.*, *Simpson* v. *Office of Chief Judge of Circuit Court of Will Cnty.*, 559 F.3d 706, 712 (7th Cir. 2009). To prevail on a claim for FMLA interference, a plaintiff must demonstrate that (1) she was eligible for protection under the FMLA, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided notice of her intent to take FMLA leave, and (5) her employer denied her the FMLA benefits to which she was entitled. *See, e.g.*, *Burnett* v. *LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). The City argues that Rodriguez cannot prove the first, third, fourth and fifth requirements for a claim of FMLA interference.

## A.     FMLA Eligibility

An employee is eligible for coverage under the FMLA if she worked for a covered employer for at least twelve months and had worked at least 1,250 hours during the twelve month period immediately preceding the commencement of the leave.  29 U.S.C. § 2611(2)(A).  The Department of Labor's regulations provide that "[t]he determinations of whether an employee has worked for the employer for at least 1,250 hours in the past 12 months and has been employed by the employer for a total of at least 12 months must be made as of the date leave commences."  29 C.F.R. § 825.11(d) (2006).[9]

Rodriguez was hospitalized for the first time on January 27, 2006 and was on leave from that date until February 10, 2006.  The City's timekeeping records show that during the 12-month period from January 27, 2005 to January 27, 2006, Rodriguez worked 1,569.25 hours.  Pl.'s SoF ¶ 7.[10]  Therefore Rodriguez was eligible for twelve weeks of FMLA leave beginning on January 27, 2006.

The City argues that Rodriguez was no longer eligible for leave as of the date of her termination because she had not worked 1,250 hours during the twelve months prior to September of 2006.  Pursuant to the regulations, however, Rodriguez was entitled to take her full FMLA leave "during any twelve month period," to be determined by reference to (1) the

---

[9] The regulations were most recently amended in 2009.  The court applies the version in effect in 2006, when the events at issue occurred.  *See Righi* v. *SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011).

[10] The City asserts that Rodriguez's calculation of the hours that she worked must be stricken because Rodriguez has not created a proper foundation for the submission of the time keeping entries from the City's time keeping system.  The City's motion is denied because the time keeping printouts that Rodriguez relies upon were produced by the City during discovery.  As the City has provided no other meaningful response to Rodriguez's calculation of hours worked, the court accepts Rodriguez's calculation as true for the purpose of resolving the pending motion.

calendar year, (2) a fixed twelve-month "leave year," such as a fiscal year, (3) the twelve-month period measured forward from the date her first FMLA leave began, or (4) a "rolling" twelve-month period measured backward from when she used any FMLA leave. *See* 29 C.F.R. § 825.200(b) (2006). An employer is entitled to use any one of these methods to calculate an employee's leave entitlements, provided that the method is applied consistently and uniformly to all employees. *Id.* § 825.200(d)(1). If an employer does not make clear that it has selected one particular method of calculating FMLA leave, then the method that provides "the most beneficial outcome" for the employee will be used. *Id.* § 825.200(e). Absent evidence that the City chose a particular method for determining the amount of FMLA leave due to each of its employees, Rodriguez was eligible to take twelve weeks of unpaid leave beginning from the first date of her first FMLA leave, or January 27, 2006. Therefore her eligibility for FMLA leave is calculated as of that date, and Rodriguez was eligible to take FMLA leave.

**B.      Entitlement to FMLA Leave**

An employee is entitled to FMLA leave if (1) she is afflicted with a "serious health condition," and (2) the condition renders her unable to perform the functions of her job. *Burnett*, 472 F.3d at 477–78; 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves . . . inpatient care in a hospital . . . or . . . continuing treatment by a health care provider." 29 U.S.C. § 2611(11). A serious health condition involves "continuing treatment by a health care provider" when an employee is incapacitated for more than three consecutive days and her subsequent treatment or incapacity relates to the same condition and involves either (1) treatment two or more times within thirty days of the first day of incapacity, or (2) a continuing regimen of treatment under the supervision

17

of a health care provider. 29 C.F.R. § 825.114(a)(2)(i) (2006). "Treatment" for the purpose of evaluating an employee's health condition "includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition." *Id.* § 825.114(b). Treatment does not include "routine physical examinations, eye examinations, or dental examinations." *Id.*

It is undisputed that Rodriguez was incapacitated for three or more consecutive days in January and February of 2006 and that SVT was a "serious health condition." The City argues, however, that Rodriguez no longer suffered from a serious health condition as of March 1, 2006, because at that point her SVT had been "cured" by the ablation procedure. Because none of Rodriguez's cardiologists found any cardiac abnormalities between March 1 and September 18, the City concludes that her doctor's visits did not constitute a continuing course of treatment sufficient to establish a serious health condition under the FMLA. Drawing all reasonable inferences in Rodriguez's favor, however, a fact-finder might find that Rodriguez's continued visits to the doctor qualified as "treatment" under the FMLA because the purpose of the visits was "to determine if a serious health condition exist[ed]" and "evaluate" whether Rodriguez was suffering from a recurrence of SVT. *See* 29 C.F.R. § 825.114(b); *see also Hodgens* v. *Gen. Dynamics Corp.*, 144 F.3d 151, 163 (1st Cir. 1998) ("It seems unlikely that Congress intended to punish people who are unlucky enough to develop new diseases, or to suffer serious symptoms for some period of time before the medical profession is able to diagnose the cause of the problem."). Even if, as the City argues, Rodriguez's SVT was "cured" by the ablation procedure, it is not clear exactly when the attempts to diagnose Rodriguez's persistent symptoms would have become superfluous. Given that Rodriguez went to the hospital from work on June

1, 2006, the notion that March 1 was Rodriguez's last day of FMLA eligibility is subject to ready dispute. The City does not contest, moreover, that Rodriguez experienced various symptoms that prompted her to visit several cardiologists. Indeed, Dr. Pacold concluded that Rodriguez had "developed a wide variety of symptoms" which, although likely not of cardiac origin, had made her anxious about her health such that she "became essentially disabled by these concerns." Def.'s Ex. 24, Pacold Dep. 37:6–39:22. The fact that Rodriguez did not receive a new diagnosis of SVT or a diagnosis of additional heart problems does not preclude her from establishing that she was afflicted by a serious health condition. *See Price* v. *City of Fort Wayne*, 117 F.3d 1022, 1024–25 (7th Cir. 1997) (holding that "several diagnoses, if temporally linked, no one of which rises alone to the level of a serious health condition [can], if taken together, constitute a serious health condition"). Based on the record before it, the court cannot conclude, as a matter of law, that Rodriguez did not suffer from a serious medical condition throughout the spring, summer, and fall of 2006.

### C.     Notice of Intent to Take FMLA Leave

"Generally speaking, it does not take much for an employee to invoke his FMLA rights; he must simply provide enough information 'to place the employer on notice of a probable basis for FMLA leave.'" *Righi* v. *SMC Corp.*, 632 F.3d 404, 409 (7th Cir. 2011) (quoting *Aubuchon* v. *Knauf Fiberglass, GmbH*, 359 F.3d 950, 953 (7th Cir. 2004)); *see also Burnett*, 472 F.3d at 478. An employee does not need to mention the FMLA in order to request FMLA-qualifying leave. 29 C.F.R. § 825.303(b) (2006). Rather, it is the employer's duty to investigate and conduct further inquiry into whether the employee's leave should qualify for leave under the FMLA. *Burnett*, 472 F.3d at 480; 29 C.F.R. § 825.302(c) (2006) ("[T]he employer should

inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought . . . ."); *id.* § 825.303(b) ("The employer is expected to obtain any additional required information through informal means.").

The record shows that when Rodriguez was hospitalized for the first time in January of 2006, she spoke to Boland and Andolino from the hospital and told Andolino that her doctors thought she was having a "heart attack." After her return work on February 10, Rodriguez again felt ill and was transported from the office to the hospital in an ambulance. Rodriguez testified that she "always" spoke with Boland or Andolino about her absences from work. Ex. 5, Rodriguez Dep. 144:14–145:16. Although she could not recall specifically what she told them on each occasion, she remembered telling Boland that she "had to go in for a heart monitor" on March 8 and 14, that she was having "chest pain" on July 25 and 31, and that she was "experiencing a lot of arrhythmias again" and would need to take leave from August 18 to 20. Def.'s SoF ¶ 56. On August 25, 2006, Rodriguez gave Dr. Al-Khaled's note to Boland, which states that "Ms. Rodriguez should be off work at least two weeks till further medical notice." Def.'s Ex. 5, Rodriguez Dep. Ex. 21 at P26-000190. Finally, on August 29, Rodriguez told McCaskill that she wanted to request FMLA leave. These incidents and conversations were sufficient to provide notice to the City as required by the FMLA.

The City argues that Rodriguez did not provide sufficient notice because (1) her leave forms and conversations with her supervisors were "vague" and (2) she knew that employees were required to fill out certain forms to take FMLA leave but failed to do so. The City's first argument focuses only on a portion of the information contained in the record and ignores the fact that Rodriguez was taken to the hospital from the office on two occasions and that she spoke

to her supervisors on numerous occasions.   Even after the ablation procedure was performed in February 2006, Rodriguez continued to tell Boland and Andolino that she was experiencing chest pains and dizziness and that she needed to visit her doctors because of these symptoms.  As Rodriguez testified, on days when she could not come to work she requested leave via a telephone call and someone else at OMP prepared the disposition forms on her behalf.  Def.'s Ex. 5, Rodriguez Dep. 101:10–102:22.  While it is true that Rodriguez's leave forms are not specific in describing why she was "out ill" or "sick," she provided additional information to her supervisors and Boland signed and approved each of Rodriguez's leave disposition forms in 2006.  *See* Def.'s SoF ¶ 63.

By asserting that Rodriguez failed to give notice because she did not fill out the required forms, the City argues, in essence, that Rodriguez waived her right to invoke FMLA leave. "[A]n employee may waive his FMLA rights if he clearly expresses to his employer that he does not wish to use the protections of the FMLA." *Righi*, 632 F.3d at 409.  The City has not cited any evidence that Rodriguez told the City that she did not wish to take leave under the FMLA. *Cf. id.* (employee sent his employer an email stating: "I do have the vacation time, or I could apply for the family care act, which I do not want to do at this time.").  To the contrary, on August 29, 2006 Rodriguez told McCaskill that she wished to request FMLA leave.  Def.'s Ex. 5, Rodriguez Dep. 257:10–258:24.  Rodriguez took the paperwork home with her and then did not return to work until September 18, when she was told of her termination.  The fact that the forms McCaskill provided turned out to be disability leave forms, rather than FMLA forms, is irrelevant to the court's assessment of Rodriguez's communication with the City regarding her

intent to take FMLA leave.[11]  For the foregoing reasons, Rodriguez provided the City with notice under the FMLA.

### D.    Denial of FMLA Benefits

Employees who are eligible for leave under the FMLA have a right to reinstatement. 29 U.S.C. § 2615(a)(1).  An employee is not entitled to return to her prior position, however, if she would have been terminated regardless of whether she took FMLA leave.  *Simpson*, 559 F.3d at 712.  Thus, "an employee may be fired for poor performance when she would have been fired for such performance even absent her leave."  *Id.* (quoting *Kohls* v. *Beverly Enters. Wisconsin, Inc.*, 259 F.3d 799, 805 (7th Cir. 2001)); *see also* 29 U.S.C. § 2614(a)(3)(B).  When an employee alleges that her employer interfered with her right to reinstatement, "[t]he employer may then present evidence to show that the employee would not have been entitled to her position even if she had not taken the leave."  *Kohls*, 259 F.3d at 804; *see also* 29 C.F.R. § 825.216(a) (2006). The employee then has the burden to prove that her employer would not have discharged her if she had not taken FMLA leave.  *Kohls*, 259 F.2d at 804.

It is undisputed that Rodriguez was fired on September 20, 2006 and that she was not reinstated to the position that she held prior to her sick leave.  Citing portions of the testimony of

---

[11] Nor is the City's position clearly supported by *Greenwell* v. *State Farm Mut. Auto Ins. Co.*, 486 F.3d 840, 843–44 (5th Cir. 2007), which is cited by the City in its memorandum.  In *Greenwell*, an employee missed a day of work because her son slid down a tin barrel into a levee located near her family's home.  She told her employer "what had happened to her son . . . that he was scared, hurt badly and that she needed leave."  486 F.3d at 842.  The employee never mentioned, however, that the fall also aggravated her son's chronic asthma condition.  The next day, when her employer advised her to fill out FMLA paperwork, she failed to do so.  The Fifth Circuit concluded that her son's fall was not an FMLA-qualifying medical condition.  In turn, because the employee had not informed her employer of her son's asthma condition, which might have been a qualifying condition, she had not provided notice of her intent to take leave under the FMLA.  *Id.* at 843.  Here, in contrast, the City had knowledge of Rodriguez's health condition.

Boland and Andolino, the City asserts that Rodriguez was terminated because of her poor job performance in 2005 and 2006. Boland's testimony, however, is equivocal as to the reason for Rodriguez's termination. Although Boland first stated that he determined that Rodriguez should be fired on account of her "poor performance," Def.'s Ex. 6, Boland Dep. 5:3–9, he later explained that "it wasn't tenable to continue the way we had been . . . [because] Teresa was frequently absent from work. She would call the day that she was to – to return and then and need – need more time off or ask for more time. And it was difficult to count on her," *id.* at 19:22–25. When Rodriguez's counsel asked Boland whether Rodriguez's absences in September of 2006 "caused [Boland] to then recommend immediate termination," Boland responded, "It was clear to me that . . . the situation where Teresa was calling in sick and – where I couldn't count on her was not – was not going to continue, and she wasn't going to find other employment, and so . . . it didn't make sense to continue to try to operate the modernization program . . . in that manner or with . . . we couldn't count on her participation in that effort, so she should no longer participate." *Id.* at 29:11–23. These statements, combined with the timing of Rodriguez's termination, support the inference that the City would not have terminated Rodriguez if she had not taken FMLA leave. *See Simpson*, 559 F.3d at 713 ("An employee's termination while she was on leave could, in some circumstances, create an inference of employer impropriety . . . ."); *see also Kauffman* v. *Fed. Exp. Corp.*, 426 F.3d 880, 885 (7th Cir. 2005) (where employer conceded that it fired employee for missing work, the outcome of the claim turned on whether employee was entitled to FMLA leave). Rodriguez, moreover, denies that she failed to perform her duties as described by Boland and Andolino. Therefore an issue of fact exists as to whether Rodriguez adequately performed her job, which in

turn is central to determining whether she was denied benefits under the FMLA. For the foregoing reasons, the City's motion for summary judgment on Count I will be denied.

## III.    Retaliation and Discrimination Under the FMLA (Count II)

Under the FMLA, it is unlawful for an employer to discharge or discriminate against an employee for opposing a practice that is unlawful under the Act. 29 U.S.C. § 2615(a)(2). Count II of Rodriguez's complaint alleges generally that the City should be held liable for "discrimination and retaliation" under the FMLA. The City argues that (1) Rodriguez cannot establish that the reassignment of her duties was discriminatory, and (2) Rodriguez cannot establish that the City's decision to terminate her was retaliatory. Rodriguez does not respond to the City's assertion that the reassignment of her duties was lawful under the FMLA. Therefore this issue is conceded in favor of the City.[12] *See, e.g.*, *Palmer* v. *Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) (arguments not presented to district court in response to summary judgment motion are waived). The City's motion for summary judgment will be granted to the extent that Rodriguez claims that the City discriminated against her by reassigning her duties. For the following reasons, the City's motion for summary judgment regarding Rodriguez's claim for unlawful termination will be denied.

A plaintiff may establish an FMLA retaliation claim under either the direct or indirect method of proof. *See, e.g.*, *Caskey* v. *Colgate-Palmolive Co.*, 535 F.3d 585, 592–93 (7th Cir. 2008); *Buie* v. *Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). To proceed under the

---

[12] With respect to Boland's statement on August 25, 2006 that Rodriguez's pay would eventually be reduced and that she would be given a different title, the City asserts that "neither ever took place." Def.'s Mem. at 8. Rodriguez does not contest this assertion and has not argued that Boland's statements, taken alone, were discriminatory in violation of the FMLA. Therefore Rodriguez has not asserted an FMLA claim that relates to Boland's statements regarding a pay reduction or formal demotion.

direct method, Rodriguez must show that the City took a materially adverse action against her on account of her protected activity. *Burnett*, 472 F.3d at 481. To proceed under the indirect method, Rodriguez must show that after taking FMLA leave she was treated less favorably than other similarly situated employees who did not take FMLA leave, even though she was performing her job in a satisfactory manner. *Id.*

Drawing all inferences in Rodriguez's favor, under the direct method, Rodriguez can show that she was engaging in activity protected by the FMLA when she took leave in early September 2006. She can also show that the City took an adverse action against her when it fired her on September 20, 2006. Boland's testimony regarding his reasons for terminating Rodriguez demonstrates that there is a causal relationship between Rodriguez's FMLA leave and her termination. Boland testified, in part, that he decided to terminate Rodriguez after she called in sick on September 12 and 14. Specifically, Boland explained that "Teresa was frequently absent from work" and "the situation where Teresa was calling in sick . . . was not going to continue." The City argues that Boland's deposition testimony cannot demonstrate a causal relationship between Rodriguez's FMLA leave and her termination because Boland was not aware that she had requested FMLA leave. The court finds the City's argument unavailing for the reasons stated above in Section II.B, which addresses the City's assertion that Rodriguez failed to provide notice of her intent to take FMLA leave. *See Burnett*, 472 F.3d at 482 (rejecting a nearly identical argument made by defendant-employer). Moreover, the fact that Rodriguez was terminated immediately after taking leave "suggest[s] a direct, causal connection between the protected activity and the adverse action." *Id.*

Because Rodriguez can demonstrate that she was terminated on account of having engaged in a protected activity, the City can prevail on its motion for summary judgment only if it "presents unrebutted evidence that [it] would have taken the adverse employment action against [Rodriguez] even if [it] had had no retaliatory motive." *Stone* v. *City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Boland testified that he decided to terminate plaintiff in part because of her poor work performance and because "she wasn't going to find other employment." Yet whether Rodriguez adequately performed her job functions in 2005 and 2006 is in dispute. The court has only been presented with the conflicting testimony of Rodriguez, Boland, and Andolino. Rodriguez denies that Boland told her to look for a new job. Because the City has not presented "unrebutted evidence" that it would have terminated Rodriguez because of her poor work performance, there are disputed issues of material fact with respect to Rodriguez's FMLA retaliation claim. Accordingly, the City's motion for summary judgment on Count II will be denied.

## IV.    Discrimination and Discharge in Violation of the ADA (Count IV)

Rodriguez must show that she is a "qualified individual with a disability" in order to succeed on her ADA claims. *See Kupstas* v. *City of Greenwood,* 398 F.3d 609, 611 (7th Cir. 2005).[13] A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the

---

[13] "[D]isability under the ADA and 'serious health condition' under the FMLA are distinct concepts that require different analysis." *Burnett*, 398 F.3d at 483.

major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.* § 12102(2). A plaintiff is limited in the "major life activity" of working if she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Kupstas*, 398 F.3d at 612 (quoting 29 C.F.R. § 1630.2(j)(3)(I)); *see also Delgado* v. *Certified Grocers Midwest, Inc.*, 282 Fed. App'x 457, 460 (7th Cir. 2008) ("The injury must limit employment generally, not merely preclude an employee from a particular job or a narrow range of jobs.").

Rodriguez concedes that she did not have a limiting impairment or a record of such impairment, but argues that the City regarded her as disabled and then fired her because of her disability. To be considered disabled under the "regarded as" prong, Rodriguez must show that (1) the City mistakenly believed that she had a physical impairment that substantially limited one or more major life activities, or (2) the City mistakenly believed that an actual, nonlimiting impairment substantially limited one or more major life activities. *Mack* v. *Great Dane Trailers*, 308 F.3d 776, 780 (7th Cir. 2002). "[I]f the condition that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is, then there is no violation of the ADA under the 'regarded as' prong of the statute." *Mack*, 308 F.3d at 782.

Rodriguez has not shown that the City believed that she was substantially limited in one or more major life activities. The record shows only that the City believed her unable to fulfill her job duties at OMP. Rodriguez argues that the City's motion for summary judgment should be denied because the City regarded her as unable to perform "a fundamental job requirement that applies almost universally across the employment spectrum[:] attendance." Rodriguez does

not cite any evidence, however, to support her assertion that the City believed that she would be restricted from working at a broad range of jobs. Nor has Rodriguez shown that Boland's remark that Rodriguez could no longer "participate" referred to anything other than her ability to contribute to the airport modernization program. The City's motion for summary judgment with respect to Count IV will be granted.

## V.       After-Acquired Evidence Defense

Finally, the City moves for summary judgment on its affirmative defense of after-acquired evidence of Rodriguez's overpayment by the City. Under the after-acquired evidence defense, an employee's damages in an employment discrimination case are limited "where there is after-acquired evidence of wrongdoing that would have led to termination on legitimate grounds had the employer known about it." *McKennon* v. *Nashville Banner Pub. Co.*, 513 U.S. 352, 362, 115 S. Ct. 879, 130 L. Ed. 852 (1995). If the employer can prove by a preponderance of the evidence that it "would" have terminated the employee because of the after-acquired evidence, the employee is not entitled to reinstatement or front pay and her back pay is limited to the period between the unlawful termination and the discovery of the evidence. *Id.*; *Sheehan* v. *Donlen Corp.*, 173 F.3d 1039, 1048 (7th Cir. 1999); *see also Edgar* v. *JAC Prods., Inc.*, 443 F.3d 501, 512–14 (6th Cir. 2006) (applying *McKennon* to FMLA discrimination claim). In determining whether the after-acquired evidence defense applies, the court's "inquiry focuses on the employer's actual employment practices, not just the standards established in its employee manuals, and reflects a recognition that employers often say they will discharge employees for certain misconduct while in practice they do not." *Sheehan*, 173 F.3d at 1048 (quoting *O'Day* v. *McDonnell Douglas Helicopter Corp.*, 79 F.3d 756, 759 (9th Cir.1996)).

In support of its motion for summary judgment, the City cites the testimony of Andolino and Boland, who both stated that Rodriguez would have been fired because of her failure to report the overpayments she received from the City. None of the other four employees who were overpaid by the City was fired, however, including those employees who failed to report the overpayment. Nor did the City fire McCaskill, who made the errors that resulted in the overpayments. The City has not cited any written policies or practices that would have required Rodriguez's termination. Moreover, the actual date when the City discovered the evidence of Rodriguez's overpayment is unclear. *See* Pl.'s Resp. to Def.'s SoF ¶ 31. Even though Rodriguez's overpayment was significantly greater than the overpayments received by other employees, there are genuine issues of material fact as to whether Rodriguez "would" have been terminated because of the overpayment. *See id.* The City's motion for summary judgment with respect to the affirmative defense of after-acquired evidence will be denied.

## CONCLUSION AND ORDER

For the foregoing reasons, the City's motion for summary judgment [#168] is granted in part and denied in part. Judgment is entered for the City on Count II of Rodriguez's amended complaint to the extent that it alleges that the City violated the FMLA by reassigning Rodriguez's duties on June 5, 2006. Judgment is entered for the City on Count IV. The parties are to appear for a status hearing on April 12, 2011.

Dated: March 25, 2011              Enter:_____
                                             JOAN HUMPHREY LEFKOW
                                             United States District Judge